**The STATE of Ohio, Appellee,**

v.

**CARPENTER, Appellant.**

[Cite as *State v. Carpenter* (1997), 122 Ohio App.3d 16.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 70612, 70614 and 70616.

Decided July 23, 1997.

18

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Peter Gauthier*, Assistant Prosecuting Attorney, for appellee.

*James R. Willis*, for appellant.

---

JAMES D. SWEENEY, Chief Justice.

Defendant-appellant James J. Carpenter, born August 12, 1959, appeals from the following consolidated jury trial convictions:

1. Appellate case No. 70612/trial court no. 318200—(a) promoting prostitution (R.C. 2907.22) and (b) possessing criminal tools (R.C. 2923.24), with violence specifications, on September 13, 1994, in Lakewood, Ohio;

2. Appellate case No. 70614/trial court no. 321794—(a) promoting prostitution (R.C. 2907.22) and (b) possessing criminal tools (R.C. 2923.24), with violence specifications, on February 15, 1995, in Westlake, Ohio;

3. Appellate case No. 70616/trial court no. 332458—(a) promoting prostitution (R.C. 2907.21 [1]), with a violence specification, on November 10, 1995, in Fairview Park, Ohio.

For the reasons adduced below, we affirm.

The offenses involved the police investigation of activities of several escort services. The escort services, which shared a common address at 1936 Columbus Avenue, Apartment 3, Cleveland, Ohio, were Positive Reactions Entertainment Group, L.A. Escorts, and Alternative Lifestyles. Evidence submitted indicated that Positive Reactions and L.A. Escorts employed female escorts, while Alternative Lifestyles provided homosexual male escorts.

---

**1.** The language used in the indictment, which was once included within the language of R.C. 2907.22, was later included in this new section number.

At the trial, the prosecution offered the testimony of seven witnesses. The first witness for the prosecution, Lakewood Police Detective Len Kozempa, testified that his department received information in 1994 that prostitution providers, posing as escort services, were operating at the Lakewood Manor Motel (now operated by Days Inn Motels). In response to this information, the witness rented a room at this motel on September 13, 1994. The police placed a radio transmitter under the bed, which was monitored by other detectives who were nearby. The witness then placed a telephone call to L.A. Escorts and, without indicating that he sought sexual services, stated that he was responding to their advertisement. The escort service explained that the charge for the female escort was $150 for dancing services, and that anything else would have to be decided between the escort and the customer. From a physical description of several available escorts, the witness ultimately chose one named Angel. When Angel arrived at the room at approximately 10:00 p.m., she removed her jacket and had the witness sign a preprinted services contract[2] titled "Model/dancer, service agreement." The witness then paid Angel the $150, in currency that had been marked by the police. Angel then took the currency and the contract and gave them to the defendant, who was standing outside the door to the room. Angel then closed the door, returned to the witness, and immediately told the witness that if he wanted sex, that it would cost more money. The witness never initiated an offer for sex. The witness asked how much more and Angel replied that fellatio for the customer would cost $100. The witness agreed to the additional service and the price and gave Angel the additional $100 in marked currency. The witness removed his shirt and sat on the bed as Angel proceeded to remove all of her clothing except for her panties. Angel then caressed and rubbed the witness's chest and back before moving her hand toward the witness's genital area, at which time the monitoring police came into the room and arrested Angel for soliciting prostitution. Angel never attempted to dance or model for the witness. At the station house, Angel volunteered that she was only sixteen years old, was a runaway from her home in Chicago, Illinois, and that her real name was Jamie Zyntowski (sometimes given in the record as Zytnowski). Recovered from her purse were blank service contracts, two vibrators, two appointment books, and miscellaneous papers, including a card bearing the inscription "To Jamie Carpenter, J.C.'s best girl. From J.C." The police, after speaking by telephone with Angel's mother, arranged to have the adolescent

---

**2.** Paragraph 4 of this contract provides:

"Client acknowledges and fully understands that services from model/dancer do not include sexual activity, physical contact, message [sic], lude [sic] or obscene performances of any kind. Client hereby agrees and acknowledges he will not attempt to persuade or purchase this type of activity from model/dancer. Model/dancer retains all rights afforded her by law should any unconsentual [sic] physical contact take place."

returned to her home in Chicago on the following day. Before leaving the police station, Angel, upon the encouragement and consent of her mother, made a written statement. In this statement, Angel generally stated that the escort services mentioned, which were owned by the defendant, were providing prostitution services and that ultimately she worked for the defendant, who would act as her driver and pimp. Also in this statement, Angel detailed how the escort service operated and how the escorts solicited prostitution. From five of the names contained in the appointment books, the police were able to get one of the persons listed, when telephoned, to come in to make a statement.

The second witness for the prosecution, Lakewood Police Detective James Sacco, testified that he was involved in the investigation of the escort services herein. He and his partner, Detective Wilkins, on the date of the Lakewood offense, were surveilling the escort service headquarters at approximately 8:00 p.m. when they observed the defendant drive up to and enter the headquarters. These officers then went to the Lakewood Manor Motel, where, at approximately 10:00 p.m., they observed the defendant drive into the parking lot with a female as a passenger and go to the room occupied by Detective Kozempa. After the arrest of the defendant at Lakewood Manor Motel, the police found a cellular telephone, a telephone pager, and the $150 in marked currency on the defendant's person.

The third witness for the prosecution, Lakewood Police Detective Bruce Wilkins, supervised and organized the investigation of the Lakewood offense. Wilkins monitored the transmission of the radio transmitter that had been placed under the bed in the room occupied by the police. He corroborated the testimony of Detectives Kozempa and Sacco. Wilkins also stated that the defendant was arrested in the hallway outside the room occupied by the police. Wilkins searched the defendant's car in the parking lot and retrieved papers relating to the escort service, including receipts and bills listing the escort service's Columbus Road address. One hundred dollars in marked currency was recovered from Angel's purse. Following the arrests, Wilkins obtained search warrants for the escort service's headquarters and for the Yorktown Motorist Hotel on Clifton Avenue in Lakewood, where Angel resided. The headquarters was searched at 12:35 a.m. on September 14, 1994, by the Cleveland Police Department, accompanied by Wilkins and several other Lakewood officers. The officers found the door to the headquarters ajar, and heard voices therein, a male and a female, talking about an incident in Lakewood and saying that the female associated with that incident "had better keep her mouth shut." Items found during the search of the headquarters include an address book listed to the defendant; a battery and battery charger for a cellular telephone; two telephone caller-identification units; an electronic business organizer which contained nu-

merous names, numbers, and dates; an inked stamp pad with a rubber stamp used as a deposit endorsement for the escort service; a Panasonic telephone with preset speed-dial numbers for hotels and motels; an answering machine; a business checkbook; six radio transceivers; numerous miscellaneous pictures and papers; a 35 mm camera; a briefcase from the female found at the time of search at the headquarters containing three sexual aid devices, a tube of KY lubricating jelly, and a washcloth; uncashed checks in a safe made payable to the escort service; and three separate telephone lines in the headquarters. Wilkins testified that these items are commonly found at prostitution providers. At approximately 4:00 a.m. on September 14, 1994, Angel's residence, which she shared with another woman, was searched. At the residence, police found miscellaneous papers and drug paraphernalia, including a syringe and a crack pipe. Wilkins also assisted the Fairview Park police in their investigation of prostitution by escort services by renting a room at the Knight's Inn Motel on Brookpark Road. The Fairview investigation used the same method of surveillance as that used at the Lakewood Manor, to wit, bugging the room occupied by the police with a radio transmitter (and a video camera during this particular sting[3] operation), contacting the escort service, observing the defendant drive up to the motel accompanied by a female escort (later identified as Jennifer Von Drak), signing the service agreement, observing the escort give the initial marked money and the contract to the defendant who was in the hallway, having the escort initiate an offer for fellatio once the door was closed, paying the escort for sex with $200 in marked money, allowing the escort to disrobe and begin performing the sexual service, and then arresting the escort in the room and the defendant who was in a car in the parking lot. Recovered from the escort were condoms and the marked money. The service contract listed the name of the escort as Samantha.

The fourth witness for the prosecution, Westlake Police Detective Robert Bowers, testified that he assisted the investigation of prostitution by escort services at the Westlake Holiday Inn on Crocker Road. Bowers was stationed in the hotel and arrested the defendant in the game room of the hotel once the escort had been arrested in the room that was under surveillance by the police. A search of the defendant's person produced a telephone pager and a black

---

3. The term "sting" was popularized by the motion picture *The Sting*, which starred actors Paul Newman, Robert Redford, and Robert Shaw, and depicted a confidence scam perpetrated upon an unsuspecting, greedy gambler (Robert Shaw), wherein the perpetrators (Paul Newman and Robert Redford), through artifice and deception, convinced the gambler to place a very large wager upon a certain horse race whose race results were known in advance to the perpetrators due to the manipulation of the existing technology of the day for reporting race results to off-track bettors. The result was the gambler losing his wager without ever knowing how he had been suckered.

satchel. This operation used the same methods as those used in the other two offenses.

The fifth witness for the prosecution, Agent 56, testified that at the time of the offense at the Westlake Holiday Inn he was employed as an undercover narcotics officer by the Westshore Enforcement Bureau [4] and assisted the Westlake police in the investigation. The agent testified that he was one of the officers who electronically monitored the activity in the room rented by the police. The escort in this offense was known as "Precious," but her real name was Christina (sometimes given in the record as Christine) Hawley, and she initiated the offer of fellatio for $50 and sexual intercourse for $150. This agent generally corroborated the testimony of Detectives Wilkins and Bowers.

The sixth witness for the prosecution, Westlake Police Officer Timothy Tolaro, testified that he was part of the team of police that investigated the offense committed in Westlake and, in particular, that he monitored the electronic devices which were hidden in the room from an adjoining room. The person who the police placed in the room was a confidential informant. Tolaro generally corroborated the testimony of the other officers in the investigation team and authenticated the audio and video cassettes of the transmissions from the room. A search of the room after the arrest produced a condom on the bed, which had been placed there by the escort. Sixteen condoms, of approximately four different types, and marked currency were found in the escort's purse. Marked currency for the initial fee, the signed service contract, and two condoms were found in the defendant's black satchel. Comparing one of the condoms found in the defendant's black bag to the condom found on the bed of the Holiday Inn room revealed that they were from the same manufacturer and had the same model number, serial number, and expiration date. The other condom found in the defendant's black bag also had the same manufacturer, model, serial number, and expiration date as some of the sixteen condoms found in the escort's purse. Tolaro also testified about his involvement in the investigation leading to the arrests in the Fairview Park offense, wherein he operated the videotape equipment from an adjoining room. He authenticated the copy of the videotape from that offense.

The seventh witness for the prosecution, Fairview Park Police Lieutenant Duane Skrletts, testified that he supervised the detectives on his police force and aided in the investigation of the Fairview Park offense, and he corroborated the

---

4. This bureau is a joint task force that investigates and prosecutes vice and narcotics activities within the communities of Lakewood, Bay Village, Fairview Park, Westlake, North Olmsted, and Rocky River.

testimony of the other officers who were involved in the investigation and who testified in this case.

At this point, the prosecution rested, and the defense moved for an acquittal pursuant to Crim.R. 29. Subsequent to oral arguments by counsel, the trial court overruled this motion.

The defense offered the testimony of five witnesses. The first witness for the defense, Leander D. Davis, stated that he was a driver for the defendant in the escort services from April to August 1994. He stated that he would transport the escort to the client's location, obtain the initial fee for the escort service and the signed service contract, and would then wait outside the room while the escort was inside with the client. The escort service had a standing policy to terminate the employment of any escort who violated the rules of the service, although to his knowledge this never happened. On cross-examination, the witness divulged that he had a felony conviction in 1993 for attempted tampering of records and that he would deliver all the money he collected from clients to the defendant.

The second witness for the defense, Brenda Fuedo, testified that she has known the defendant since 1987, presently lives with him, and that she keeps the escort services' books and interviews the escorts, whom she considers independent contractors, when they are hired. During these interviews, she would tell the prospective employee that there was to be no sexual activity with a customer and would stress that this was a requirement for continued employment. When confronted with the checkbook that was seized in the search of the headquarters, the witness admitted that, despite being the bookkeeper, she never wrote a check from that register.

The third witness for the defense, Soulon P. Douglas–Christian, testified that she has known the defendant for approximately five years. She also stated that she worked at the services' headquarters for a time, interviewing prospective escorts, answering phones, and occasionally going out on calls to a customer's location. Relative to the interview process and the company rules forbidding sexual activity with a customer, she corroborated the testimony of Fuedo. Douglas–Christian claimed that she would refuse to deal with a customer who would call the service and request sexual activity. On cross-examination, she divulged that she has been convicted for forgery and grand theft.

The fourth witness for the defense, Christina Hawley, against the advice of counsel, testified that she has known the defendant for approximately one and one-half years. She stated that she interviewed prospective escorts, answered phones, and went out on calls to customer locations. She also corroborated the testimony of Fuedo and Douglas–Christian relative to the interview process and the company rules forbidding sexual activity with a customer. Next, she stated that the initial service fee collected from a customer was supposed to be divided

between the driver, the defendant, and the escort. She admitted that she went beyond the nude dancing and modeling services provided by the company on the night she was arrested at the Westlake Holiday Inn, but stated that the customer initiated the demand for sexual activity. She also claimed that the defendant had nothing to do with the sexual activity involving the customer at that hotel, and that she was given the condoms found in her purse at Numbers nightclub several days prior to her arrest. She also claimed that she was employed by the defendant in November 1995, but worked only in the office. On cross-examination, she divulged that she has convictions for seven counts of forgery and one count of theft in two separate cases from different counties. When pressed by the prosecutor, the witness stated that she did not lie to the court on November 2, 1995, at the time of a hearing in another criminal case before a different judge, that she had no contact with the defendant despite the fact that she interviewed Von Drak as a potential escort on November 8, 1995. Hawley was living with the defendant at the time. Hawley was also caught in a untruth when she stated on direct examination that she had been terminated by the defendant in February 1995 and had had no contact with him until November of that year, yet, on cross-examination indicated that she worked in the escort service office in May 1995. Further on cross-examination, the witness admitted to the following:

"Q. So you'll say anything at any time just because you think someone wants to hear it?

"A. Basically, yes."

Hawley also claimed that she never had sexual contact with any customer, that she had not danced for a customer in years, and that the defendant did not pay her for working at the escort service office, since she did it as a favor to him.

The fifth witness for the defense, Jennifer Von Drak, testified that when she interviewed with the escort service in November 1995, she was told that the service was not "full service," meaning that sexual contact with a customer was forbidden. The witness also stated that the defendant, who acted only as her driver, had nothing to do with her extracurricular sexual activity with the customer on November 10, 1995, in Fairview Park. She claimed that she desperately needed $200 to pay overdue rent on her apartment on November 11, 1995. Inside the coat she wore to the room on the night of the offense, which coat she borrowed from Hawley, were three condoms. The witness claimed that the customer initiated the request for sexual activity. After the arrest, she did fill out a statement for the police, but she testified that she had been scared and intimidated by the police and did not tell the truth in the statement when she stated that she initiated the sexual activity from the customer and that Hawley and the defendant coached her on how to make extra money by providing sexual services. On redirect examination, the witness claimed that she was terminated

by the service following her arrest, at which time she moved in with Hawley for a couple of weeks, but that neither the defendant nor Fuedo lived there with them.

At this point, the defense rested. The defense renewed its motion for acquittal, and again the court overruled the motion. The parties then made their closing arguments to the jury. After receiving instructions, the jury returned the above-mentioned convictions.

The appellant presents four assignments of error for review.

"I

"The court erred when it ruled the state's most crucial, indeed its fulcrum witness, was 'unavailable' within the ambit of Evid.R. 804(A)(5), and for that reason a written statement (exhibit 7) taken from her by the police was inadmissible as substantive proof of the appellant's guilt."

Evid.R. 804(A)(5) provides:

"(A) Definition of Unavailability. 'Unavailability as a witness' includes situations in which the declarant:

"* * *

"(5) is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under division (B)(2), (3), or (4) of this rule, the declarant's attendance or testimony) by process or other reasonable means. A declarant is not available as a witness if the declarant's exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying."

The record reflects that the local authorities attempted to procure the attendance of Angel, a.k.a. Jamie Zyntowski or Zytnowski, through the issuance of a subpoena directed to her suburban Chicago, Illinois residence and the provision of an airline ticket for her use in traveling to Cleveland for the trial. The record further reflects that Detective Wilkins spoke with the witness's mother three times by telephone, each time receiving assurances that the witness desired to testify. With the trial approaching in several days and it becoming apparent that the witness was thinking about not testifying, Detective Wilkins secured the help of Detective Larry Byce of the Woodridge, Illinois Police Department in an effort to locate the witness. Detective Byce was unable to locate the witness and learned that the witness's uncle, who also lived at the Illinois residence, had no idea as to the witness's whereabouts.

Appellant argues that the authorities should have used the Uniform Act to Secure the Attendance of Witnesses from Without the State, codified at R.C. 2939.26, to secure the attendance of Zyntowski. This argument is without merit. As we held in *State v. Young* (Cuyahoga 1984), 20 Ohio App.3d 269, 272, 20 OBR 332, 335, 485 N.E.2d 814, 817, where the state has made a good faith effort to secure the attendance of an out-of-state witness, as was done in this case, and that witness is unwilling to cooperate, it is "not reasonable to expect the prosecution to expend the time and energy to set the wheels of the Act in motion."

Accordingly, the trial court did not err in finding that Zyntowski was an unavailable witness.

The first assignment of error is overruled.

The second and third assignments of error will be discussed jointly because they both argue that Zyntowski's written statement to the police, which was made immediately after her arrest, was not against the declarant's interest pursuant to the hearsay exception contained in Evid.R. 804(B)(3).

"II

"For a statement assertedly made by a nontestifying declarant to be properly admitted under favor of Evid.R. 804(B)(3), the proponent of such proof must establish *inter alia* that the statement was indeed against the interest of the declarant. . Because the state failed to establish that the written statements were against the nontestifying declarant's interest, it follows that the court erred in admitting the statement as substantive proof."

"III

"To the extent that certain critical segments of a written statement, admitted on the basis of Evid.R. 804(B)(3), were clearly not against the nontestifying declarant's interest, the court erred and the appellant's right of confrontation was egregiously violated by their admission as proof of guilt."

The hearsay exception contained in Evid.R. 804(B)(3) provides:

"(B) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"* * *

"(3) Statement Against Interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or *criminal* liability, or to render invalid a claim by the declarant against another, that a reasonable person in the

declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." (Emphasis added.)

Applying this rule to the case before us, three factors must be demonstrated to hold Zyntowski's written statement to the police admissible: (1) that Zyntowski was unavailable as a witness, (2) that the statement was against Zyntowski's interest, tending to subject her to criminal liability, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement. See, *e.g.*, *State v. Gilliam* (1994), 70 Ohio St.3d 17, 20, 635 N.E.2d 1242, 1245–1246; *State v. Long* (May 18, 1997), Cuyahoga App. No. 70739, unreported, 1997 WL 232624.

From our discussion in the previous assignment, we conclude that the first *Gilliam* factor has been established. Also, in the police statement (which was read into the record at the trial), the declarant admitted to engaging in multiple sexual acts for a prostitution enterprise posing as a legitimate escort service, with the full knowledge of the defendant-business owner who drove the escorts to their customers, and who also knew that the other women working as escorts for him were committing acts of prostitution. This statement tends to subject the declarant to criminal liability. Thus, the second *Gilliam* factor has been established.

In discussing the third *Gilliam* factor, we note the following passage from *State v. Long, supra,* at 7:

"With regard to whether the third element of the rule was satisfied, we note the following excerpt from *State v. Branham* (1995), 104 Ohio App.3d 355, 359, 662 N.E.2d 54 [56–57], discretionary appeal disallowed in (1995), 74 Ohio St.3d 1444, 656 N.E.2d 344:

" ' "[A] bare showing of some extent of corroboration is not enough. Instead, the rule contemplates a demonstration of corroborating circumstances * * * which, on balance, persuade the trial judge that the statement bears the clear indicia of reliability and trustworthiness, leaving the ultimate determination of credibility to the jury." *State v. Saunders* (1984), 23 Ohio App.3d 69, 73, 23 OBR 132, 137, 491 N.E.2d 313, 319. See, also, *Lowery v. Maryland* (D.Md.1975), 401 F.Supp. 604, 607–608, affirmed without opinion (C.A.4, 1976), 532 F.2d 750. "The determination of whether corroborating circumstances are sufficient to admit statements against penal interest as a hearsay exception generally rests within the sound discretion of the trial court." [*State v.*] *Landrum* [1990], *supra,* 53 Ohio St.3d [107] at 114, 559 N.E.2d [710] at 720.' "

Having carefully reviewed the trial record, we conclude that the trial court did not abuse its discretion in finding that the third factor of *Gilliam*, indicia of the statement's trustworthiness and reliability based on the corroborating circumstances, were demonstrated. This is so based on (1) the fact that the declarant made the statement soon after the arrest and after having had an opportunity to have spoken with her mother in Illinois, who urged her wayward daughter to fully cooperate with the police; and (2) the declarant's knowledge of the escort services' operation and procedures, and the defendant's role therein, which was corroborated by evidence seized by the police and by the testimony of other witnesses who helped in the investigation of the services or who were actually associated with the services in question.

Accordingly, the second assignment of error is overruled.

■ Appellant suggests in his third assignment that those limited portions in the police statement of Zyntowski which inculpate the defendant-appellant, yet do not inculpate the declarant in criminal activity, should have been deleted and not admitted pursuant to Evid.R. 803(B)(3). While this is a correct interpretation of Fed.Evid.R. 803(B)(3) pursuant to *Williamson v. United States* (1994), 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476, the lone inculpatory statement concerning the defendant (which alleges that the defendant had knowledge that the escorts were performing prostitution and that by acting as a driver the defendant was promoting prostitution) occurred after the defendant was identified as the owner of the services and acted as a driver, which actions by themselves do not inculpate the defendant in criminal activity:

" 'After I collected my original $150, I would then collect more money by offering to do sex acts on the client. I would set my fees to what I think that I could get. Any of the money that I could get'—excuse me. 'Any of the money that I would collect was all mine to keep. *James knew* that I was doing this all along with all the other girls. All the girls were doing this, to hook on the side and make the big bucks.' "

■ Applying *Williamson*, this statement—"James knew"—should have been deleted because it does not inculpate the declarant in criminal activity. Although it was error, we conclude that it was harmless error because the defendant's knowledge of ongoing prostitution activities within the escort services under his ownership and control was demonstrated by other evidence in the record, specifically, the following: condoms found on his person and in the possession of the escorts that matched manufacturer, style, serial number, and expiration date, that were evidence that he supplied the escort with prophylactic protection; the evidence indicating that the escorts received no pay from the services, indicating that any reasonable person would conclude that the escorts, who were not

involved in a charitable enterprise or pro bono services, were making their money on side activity which any reasonable employer who drove the escorts and controlled the services' office must have had knowledge of considering the circumstances.

Accordingly, the third assignment of error is overruled.

"IV

"The court erred in openly approving, and otherwise endorsing and thus adding the court's imprimatur to, the prosecutor's assailment of crucial defense witnesses as liars and the like."

This final assignment argues that the court erred in permitting the prosecution, during closing argument, to characterize certain defense testimony as lies or the witness as a liar. In reviewing the closing argument of the prosecutor, we note that there are nine instances of this conduct by the prosecution. The defense objected only to the first instance and was overruled by the trial court. The defense having failed to timely object to the remaining instances waived error therein for appellate purposes. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Even had the objection been preserved for appeal, and where it was properly preserved, we would conclude that the characterization was a fair comment based on the testimony presented where witnesses admitted to crimes of dishonesty or had been confronted with prior statements that did not correspond to their court testimony, or their testimony was clearly contradictory to other testimony.

The fourth assignment of error is overruled.

*Judgment affirmed.*

BLACKMON and PORTER, JJ., concur.